Bbinkebhoff, O.J.
We are of opinion that tbe court below did not err in tbe determination of either of tbe questions above mentioned.
Under tbe common-law system of criminal procedure' which we inherited from England, when a person indicted put in a plea in abatement on the ground of misnomer, and. such plea was found to be. true, tbe result was that be must either be discharged, or proceeding^ against him for tbe alleged crime by tbe name disclosed in bis plea must be begun de novo. To avoid tbe delay and inconvenience of this roundabout method of proceeding, our recently enacted Code of Criminal Procedure, 66 O. L. 304, sec. 112, wisely following in tbe wake of recent legislation by tbe British Parliament for tbe attainment of similar ends, provides — “If tbe accused shall plead in'* abatement that be is not indicted by bis true name, be must plead what bis true name is, which shall be entered on tbe minutes of tbe court; and after such entry, tbe trial and all other proceedings on tbe indictment shall be bad against him by that name, referring also to the name by which be is indicted, in tbe same manner in all respects as if he bad been indicted by bis true name.” In tbe case before us, these provisions of tbe Code of Criminal Procedure were, in tbe court below, strictly con *50 formed to; and the record shows that in all proceedings against the accused bad and taken subsequent to the ruling of the court upon the plea in abatement, he is designated as “ William H. Lasure, who is indicted by the name of Henry Lasure.” As to this, the counsel for the plaintiff in error make no question.
But it is urged in his behalf — and here is the only serious question in the case, as we think- — -that the provisions of the section of the Code of Criminal Procedure above quoted are in contravention of the clause of article 1, section 10, of the constitution of this State, which provides, that, except ^ in cases of impeachment, and cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and in cases of petit larceny and other inferior offences, no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment oM indictment of a grand jury?
Now, it is urged that in law and in fact the plaintiff in error was held to answer' and tried on an indictment not found against him by a grand jury — the indictment found .and presented by the grand jury being against Henry La-.sure, when he in fact was tried, convicted, and sentenced as William H. Lasure.
The argument at first blush certainly appears not without r.plausibility; and it leads us to inquire what is an indictment %
Blackstone (vol iv., marginal paging 302) thus defines it: •“ An indictment is a written accusation of one or morej?^.sons of a crime or misdemeanor, preferred to, and presented upon oath by, a grand jury.” An indictment, then, is an .accusation of a person of crime. It is an accusation against a person, and not against a name. A name is not of the substance of an indictment. And a person may be well indicted, without the mention of any name, and designating him as a person whose name is to the grand jurors unknown. ■Or a person may be indicted by a name wholly imaginary ¡and fictitious, as John Doe or Richard Roe; and, unless he *51 interpose the plea of misnomer in abatement, by such name he may be tried, convicted, and sent to the penitentiary.
By the plea in abatement filed in this case — and which is, in form and substance, the ordinary plea of misnomer — the accused does not deny that he is the person accused of the crime named in the indictment. In effect he admits that he is that person. He thereby raises no question in respect to whether he is, or is not, the person accused in the indictment of the crime therein charged, nor does the finding of the truth of that plea determine any such question. The plea, and the finding thereon, relate only to the name, as a matter of personal description.
True, a person accused of crime and indicted by a wrong name, had, and has, alike under the former and under the present system of criminal procedure, the right to plead the misnomer and disclose his true name; and for this sole reason — in order that, in case of a subsequent prosecution for the same crime, he may have the benefit of the record of the first prosecution in support of a plea of former acquittal or conviction. This important right of the accused is as well protected under the Code of Criminal Procedure as it was at common law; every safeguard of the innocent is preserved in its integrity, while the speedy condemnation and punishment of the guilty is — as it ought to be — facilitated. But, it may be asked, suppose the indictment is against John Doe, and there are two John Does; and the wrong one is arrested and held in custody. Or suppose the sheriff mistakes the person and arrests Richard Roe, and holds him in custody instead of John Doe; — what then? I answer, he has at least two remedies, and may avail himself of either. He may to the indictment plead not guilty, and go to trial on that plea, under which the State must prove that he — not a name — is guilty of the criminal act charged; or, he may avail himself of the benefit of a writ of habeas corpxis, and, on a satisfactory showing, procure his immediate release, as being illegally held in custody.
And now, as to the second question made in the case. It is this in substance. The indictment charging the larceny *52 of the property of Redman only, was it sufficient to warrant a conviction to prove the larceny of the property of the said Redman and one Clinesmith as partners ? This question seems to us to be answered by the 97th section of the Code of Criminal Procedure (66 O. L. 302), which provides, that “ when any offence shall be committed upon, or in relation to any property belonging to several partners or owners, the indictment for such offence shall be deemed sufficient if it allege such property belonged to any one or more of such partners or owners, without naming all of them.”
This legislation is express. “ It shall be sufficient to allege” certain facts. If it be sufficient to allege them, surely it must be sufficient to prove them as alleged. It was competent- for the legislature thus to enact; nor is it claimed that there is anything- in the constitution of the State to prohibit it. Even at common law it was sufficient, where property was alleged to be that of a person named, to prove, as against a wrongdoer, that he had simply a right of possession — as bailee, for instance. And it would be entirely within legislative competence, we think, to enact that it should be sufficient, in order to constitute larceny, to allege and prove the felonious stealing of the property of another, without naming any person whomsoever to be the owner. This is not controverted in argument.
But it is urged in argument that this provision of the Code of Criminal Procedure is but a revision of prior statutory provisions on the same subject, and that it is an established rule in the interpretation of statutes, that, in such case, “ neither an alteration of phraseology, nor the omission or addition of words in the later statute, shall be held necessarily to alter the construction of the former act. And the court is only warranted in holding the construction of a statute, when revised, to be changed when the intent of the legislature to make such change is clear,” etc.; and cites Dutoit v. Doyle, 16 Ohio St. 405. Now, we admit the rule as stated to be a correct and established one; but we cannot admit the assumption on the ground of which it is sought to be made applicable to this provision of the Code of Criminal Procedure. *53 The Code of Criminal Procedure is not, nor was it intended to be, a revision of tbe law, whether common or statutory, on the subjects embraced by it. On the contrary, whether we give it a cursory reading or a careful examination, it is apparent that it was intended to introduce a change, amounting almost to a revolution, of our system of practice and procedure in criminal cases ; and it is not difficult to trace the outlines of the history of this radical change, and of the reasons which dictated its adoption.
1 have said that, up to the time of the enactment of the Code of Criminal Procedure, our system of practice and procedure in criminal cases was inherited, substantially, from England. During the period within which this system was in the process of formation by the accumulation of successive precedents, the English code of criminal punishments was barbarous and bloody; so that when Blackstone wrote Iris Commentaries — but little more than a century ago — no less than one hundred and sixty different crimes stood defined on the statute books of the Parliament of England, in full force, and each and all, on conviction, incurring the penalty of death. 4 Bl. Com. 18. From the consequences of such laws, the humane instincts and principles of the wise and good men, in the main, who occupied the English bench revolted, and led them, in the trial of persons accused of felony, to seize upon every technical quibble, every point of an artificial logic, and every-appearance of irregularity of proceeding having the semblance of plausibility, to secure the acquittal of persons accused, and so to prevent the infliction of punishment excessively severe. And so, step by step, and atom by atom, was our old common-law system of criminal procedure built up and established — a system so honeycombed with loopholes of escape for the criminal, as to excite the disgust of the reflecting lawyer, and the wonder of intelligent laymen. Then came an era in which it was proclaimed and believed, that, for the prevention and repression of crime, speedy conviction and certainty of punishment were more effective and valuable to society than severity of punishment. . Under the influence of this rational doctrine, *54 the number of capital crimes was by legislation pruned down, the severity of penalties was mitigated, and the amount of penalty, in the main, reasonably well graduated in conformity to the magnitude of the crime committed. Then followed a long period during which, though punishments had been mitigated and reduced to a humane and just measure, nothing at all, or next to nothing, was done to ensure speedy and certain punishment of actual guilt. Finally Lord Campbell’s act, so called (14 and 15 Yict. C. 100), passed the British Parliament, by which (in the language of Mr. Archbold) “ the whole mass of little points and legal subtleties in indictable cases were swept away,” so that criminal trials would thereafter be conducted upon the merits, and the merits alone; and a system of criminal procedure was introduced, under which, while every safeguard of the innocent was carefully preserved, the speedy and certain conviction and punishment of the guilty was facilitated and promoted. It is evident' that the provisions of our Code of Criminal Procedure were largely borrowed from Lord Campbell’s act; that it aims at similar ends through similar means, and is animated by a similar policy. That it is defective and unwise in some of its provisions, inviting legislative amendment, is not unlikely. It would be strange if it were not so. But I believe it to be a step, and a long step, in the right direction; and while it remains as the authoritative expression of the will of the legislative body of the State, it will be the duty of the judiciary to administer and enforce it in the spirit in which it was conceived, and in furtherance of the policy it was intended to introduce.
We find no error in the record and proceedings of the •court below, and the judgment is affirmed.
Scott, Welch, White, and Day, JJ., concurred.